IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

KAREN LOUANN STEVENSON,

Plaintiff,

vs.

NANCY A. BERRYHILL, Acting Commissioner of Social Security,

Defendant.[1]

Civil No. 17-cv-148-JPG-CJP

## MEMORANDUM and ORDER

In accordance with 42 U.S.C. § 405(g), plaintiff Karen Louann Stevenson, represented by counsel, seeks review of the final decision of the Commissioner of Social Security denying her applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) Benefits pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for disability benefits in August 2014 alleging disability beginning on August 6, 2014. (Tr. 331, 338.) After holding an evidentiary hearing, ALJ Mathias Onderak denied the applications on February 9, 2016. (Tr. 175-84.) The Appeals Council granted plaintiff's request for review. (Tr. 189.) After remand by the Appeals Council, ALJ Onderak held another hearing and again denied the applications on September 6, 2016. (Tr. 19-32.) The Appeals Council denied review, and the September 6, 2016, decision became the final agency decision subject to judicial review. (Tr. 1.)

Plaintiff has exhausted administrative remedies and has filed a timely complaint.

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. *See* https://www.ssa.gov/agency/commissioner.html (visited Feb. 7, 2017.) She is automatically substituted as defendant in this case. *See* Fed. R. Civ. P. 25(d); 42 U.S.C. § 405(g.)

## Issues Raised by Plaintiff

Plaintiff raises the following issues:

1. The residual functional capacity (RFC) determination was not supported by substantial evidence.

2. The credibility determination was erroneous.

## Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[2] For these purposes, "disabled" means unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities and that is done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step

[2] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423 *et seq.*, and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c *et seq.*, and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925, detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

> assesses an applicant's residual functional capacity ("RFC") and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008); *accord Weatherbee v. Astrue*, 649 F.3d 565, 568-69 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Secretary at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984); *see also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to understand that the

scope of judicial review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled during the period under review, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *See Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)). This Court uses the Supreme Court's definition of substantial evidence, *i.e.*, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## **The Decision of the ALJ**

ALJ Onderak followed the five-step analytical framework described above. He determined that Ms. Stevenson had not been engaged in substantial gainful activity since the alleged onset date and that she was insured for DIB through December 31, 2018.[3]

The ALJ found that plaintiff had severe impairments of cystocele without mention of uterine prolapse, overactive bladder, female stress/urge incontinence, non-insulin dependent type 2 diabetes with related mild peripheral neuropathy, and dizziness.[4] He found that these

---

[3] The date last insured is relevant only to the claim for DIB.

[4] A cystocele, also called an anterior prolapse, "occurs when the supportive tissue between a woman's bladder and

impairments do not meet or equal a listed impairment.

The ALJ also found that plaintiff suffered from depression and personality disorder but that these were not severe impairments. Accordingly, he did not assess any mental limitations.

ALJ Onderak concluded that plaintiff had the RFC to perform a full range of work at all exertional levels with the following limitations:

- Close proximity to an accessible bathroom;
- Option to take regularly scheduled work breaks at her discretion; and
- No exposure to unprotected heights or "concentrated exposure" to dangerous or hazardous machinery.

Based on evidence from a vocational expert (VE), the ALJ determined that plaintiff was able to do her past work as a supervisor or houseparent in a group home. In the alternative, she could perform other jobs which exist in significant numbers in the national and local economies, and, therefore, she was not disabled.

The same ALJ had issued the first decision denying plaintiff's application. The RFC assessment in the first decision was the same as the assessment in the decision at issue. (Tr. 175-84.)

**The Evidentiary Record**

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

**1. Agency Forms**

Some of the documents normally found in this section of the administrative record were

---

vaginal wall weakens and stretches, allowing the bladder to bulge into the vagina. Anterior prolapse is also called a prolapsed bladder." https://www.mayoclinic.org /diseases-conditions/cystocele /basics/definition/con-20026175 (visited Oct. 26, 2017).

not included in the record before the ALJ and are not included in the transcript filed with the Court. These missing documents include (at least) so-called Disability Reports prepared both by agency employees and by plaintiff. In the Commissioner's brief, counsel states that he "was able to locate" these forms. Doc. 24, p. 15, n. 1. The Commissioner offers no explanation for why the record is incomplete or any assurance that the documents referenced in her brief are the only ones that are missing. Copies of the forms referred to by counsel are attached to the Commissioner's brief.

**2. Evidentiary Hearing**

Plaintiff was represented by counsel at the hearing in August 2016. (Tr. 41.) She was then 48 years old. (Tr. 49.)

Ms. Stevenson was 5 feet, 3 inches tall. She weighed 196 pounds. She said that she had a lot of trouble bending over and walking very far, and her weight put extra pressure on her feet and legs. She had neuropathy. Her feet and ankles always felt tingly and prickly. It was worse when she was up walking. Both of her feet and lower legs swelled, worse on the left. (Tr. 49-54.)

Plaintiff continued to have "severe incontinence." She leaked urine even after urinating into the toilet. When she "finally" got the urge to urinate, she would urinate on the way to the bathroom. She wore disposable pads. Any pressure on her lower stomach caused her to lose control. She leaked urine when she sat up in bed. She had to sleep on a double towel. She changed her clothes at least two to three times a day because her clothes got urine on them. (Tr. 59-60.)

Plaintiff suffered from depression. She said she had no desire to do anything, did not clean her house and did not care about her own hygiene. She would go two weeks without taking

a shower. She isolated herself and did not talk to anyone except her children and mother. She did not allow company to come to her house. She felt like she had lost everything in her life that she cared about and did not care what happened to her. She thought about harming herself. (Tr. 57-58.)

A VE also testified. The ALJ asked her a hypothetical question which corresponded to the RFC assessment. The VE testified that this person could do jobs which exist in the national and regional economies such as mail clerk, receptionist and information clerk, and hospital cleaner. (Tr. 63-65.)

At a hearing held before the Appeals Council remanded, a different VE testified, based on the same hypothetical question, that the person would be able to do plaintiff's past work as a supervisor or house parent in a group home. (Tr. 124-30.)

**3. Medical Records**

Plaintiff received primary healthcare from Centralia Family Health Center. She was usually seen by PA Kendra Bowen or by a nurse practitioner. On October 30, 2013, plaintiff complained to PA Bowen of an overactive bladder. She had a long history of bladder problems. She had a sling placed years ago but it had not helped. She had been referred to a specialist but had not followed up with him because it was hard for her to get to Mt. Vernon with her work schedule. She had increased urinary frequency and urgency. Plaintiff thought she had a urinary tract infection, but the lab work was negative. The primary care provider noted that she needed to see a urologist or gynecologist who specialized in this area. (Tr. 478-81.)

Plaintiff saw Dr. David Asbery, an OB/GYN, on a referral from her primary care provider in July 2014 for her bladder problems. On exam, she had a grade II cystocele, grade II rectocele, hypermobile urethra sling and evidence of banding syndrome. (Tr. 531-33.) Dr. Asbery saw her

again in August 2014 after doing some testing. He called it "a very confusing case." He noted that she had a sling placed years earlier for urge incontinence with no improvement. Over the last year and a half, she had begun having problems such as difficulty voiding, spraying, delayed voiding, increased urgency, and incomplete emptying the bladder. He recommended surgical removal of the sling, cystoscopy, and repair of the cystocele and rectocele. He discussed with plaintiff the possibility that there may not be improvement of the urgency problem and that she might need repeat surgery. (Tr. 527-29.) Dr. Asbery performed surgery on September 11, 2014. (Tr. 545-47.)

PA Bowen prescribed Lasix for swelling in plaintiff's hands and feet in October 2014. She also instructed plaintiff to elevate her extremities. (Tr. 717-20.) Two weeks later, the swelling had resolved but she still had numbness in her right foot. Neuropathy was suspected. (Tr. 721-24.) She returned to PA Bowen in November 2014. She was still getting swelling in her legs. She also complained that the bladder surgery had not helped and that she was "leaking a lot of urine" and was "very unhappy and upset." (Tr. 725.)

According to Dr. Asbery's notes, following the surgery, plaintiff continued to have symptoms of type 3 urinary incontinence and urge incontinence.[5] In November 2014, Dr. Asbery performed another surgical procedure consisting of cystoscopy and periurethral collagen bulking.[6] He noted, "Urethra was very short, making this a very difficult case, optimal bulking was marginal at best." He expressed concern that "this may not get the patient to where she needs to be." She

[5] "Stress incontinence happens when physical movement or activity — such as coughing, sneezing, running or heavy lifting — puts pressure (stress) on your bladder. Stress incontinence is not related to psychological stress. Stress incontinence differs from urge incontinence, which is the unintentional loss of urine caused by the bladder muscle contracting, usually associated with a sense of urgency." https://www.mayoclinic.org/diseases-conditions /stress-incontinence/symptoms-causes/syc-20355727 (visited Oct. 27, 2017.

[6] "Urethral bulking to treat urinary incontinence involves injecting material (such as collagen) around the urethra." https://www.webmd.com/urinary-incontinence-oab/urethral-bulking-for-urinary-incontinence (visited Oct. 27, 2017).

might need a urethrovesical junction sling. (Tr. 625-26.) His office administered physical therapy for pelvic floor rehabilitation in December 2014 and January 2015. At the initial evaluation, she reported that she was voiding all the time, had no bladder control and had fecal urgency. She had these symptoms since the September 2014 surgery. She was using six thick Attends pads per day. She reported no improvement following the course of therapy. (Tr. 627-63.)

Plaintiff returned to PA Bowen on January 30, 2015. She had not had any medicine for a couple of weeks because she could not afford the co-pays. She was depressed and crying often. She was having suicidal thoughts so she started going to "the CRC,"[7] which had helped. She was still having bladder problems and was upset over her incontinence. On exam, she was "sad and crying excessively." She was diagnosed with major depression. PA Bowen prescribed Zoloft and recommended that she continue with counselling. (Tr. 729-32.)

Plaintiff saw Dr. Sajjan Nemani for neuropathy in her feet in January and February 2015. Dr. Nemani prescribed Neurontin, but plaintiff could not afford to fill the prescription. Neurological exam showed decreased vibration sense in her feet and decreased sensation to pinprick, both greater on the right. EMG and nerve conduction studies showed mild diffuse length-dependent sensory polysomnography with axonal features. She had mildly elevated blood sugar which required further investigation. She was continuing to have "a lot of bladder issues" and was scheduled for another bladder surgery in March. The doctor noted that this type of neuropathy very often comes from diabetes and asked her to follow up with her primary care physician. (Tr. 799-802.)

There is no indication that plaintiff had bladder surgery in March 2015.

[7] Subsequent records suggest the CRC is the Community Resource Center in Centralia, Illinois.

In May 2015, Dr. Nemani saw plaintiff to follow up on vertigo and headaches. She was crying during the visit and claimed "she really does not care anymore." She was seeing a counsellor at CRC every Monday. Dr. Nemani diagnosed depression. She did not want to take antidepressants because of the side effects. The doctor said it appeared that some of her issues stemmed from interrupted sleep. She was up at least four times a night due to "urological issues." (Tr. 787-88.)

In June 2015, PA Bowen noted uncontrolled type 2 diabetes along with depression and anxiety. (Tr. 761-63.) The next month, her diabetes was described as controlled. She was taking Glucophage, Effexor, and Valium, along with a number of other medications. (Tr. 765-67.)

Plaintiff saw Dr. Gary Reagan, a urologist, in October 2015 on a referral from her primary care provider. She said she did not feel the urge to void and then had sudden total incontinence. She was able to hold her urine at night while she was lying down, but when she sat up she had urinary incontinence. A CT scan showed bladder stones which may have resulted from residual sling fragments in the bladder. Dr. Reagan recommended a cystoscopy with laser lithotripsy of bladder stones. Plaintiff said she wanted to have the procedure. Dr. Reagan also noted she was scheduled to have bladder suspension surgery performed by Dr. Asbery. (Tr. 772-74.)

Plaintiff was hospitalized for a seizure in November 2015. (Tr. 777.)

Plaintiff saw a psychiatrist, Dr. Judy Keeven, for an initial evaluation on December 1, 2015. Dr. Keeven saw her at the Community Resource Center. The doctor noted that plaintiff had first presented to the CRC on December 9, 2014, for depression and had been seeing "Carlie" for individual therapy since then. Plaintiff had a history of episodes of depression in the past. The current depression started after the September 2014 surgery to remove the bladder mesh. She

had suicidal thoughts for the first time in November 2014. This was the most severe depression she had ever had. She felt "useless and worthless." She continued to have urinary incontinence several times per day. She only left home for doctor's appointments because it was embarrassing to have urinary incontinence in public. Dr. Keeven noted that her legs were swollen. The initial diagnosis was major depression, recurrent and severe; rule out bipolar mood disorder. She was to start a trial of Effexor and to continue with counselling. (Tr. 778-81.)

Plaintiff returned to Dr. Keeven in March 2016. She had stopped taking Effexor because it made her sleep more than 12 hours a day. She was to try Paxil. (Tr. 826-30.) She was seen by an advanced practice nurse in Dr. Keeven's office in June. She was taking Paxil, which was helping her mood, but she was tearful about two times a week. She got up a number of times per night because of bladder incontinence. She felt hopeless regarding her living situation. She did not want to leave her home and had suicidal thoughts but no plan. The impression was "improvement of depression with Paxil. Life stressors are overwhelming." (Tr. 854-58.)

The transcript contains notes from counselling sessions with Carlie Kasten at the Community Resource Center from April through August 2016. (Tr. 845-66.) In July, Ms. Kasten noted that plaintiff's depression and anxiety had increased and she reported "more times of hopelessness." (Tr. 859.) These notes indicate that her "initial enrollment date" was December 8, 2014, and she been diagnosed with major depressive disorder in October 2015 by a Lindsay Smith. (Tr. 860.) On July 27, 2016, Ms. Kasten noted that her hygiene was "very poor." Plaintiff reported hopelessness and isolating, along with an increase in depression. (Tr. 866.)

When she returned to Dr. Keeven on August 10, 2016, plaintiff reported that Paxil was "working perfectly" and she was in a good mood and could laugh and joke. However, she also said that she felt "emotionally detached" and did not care about anything. Her water had been

shut off for two weeks and she "did not care that she could not shower unless her mom picked her up." She also reported that she could not get all of her medications filled every month. She had been out of Paxil for over a week and "just lies in bed. Not sleeping, cries a lot." Dr. Keeven's impression was "marked improvement of depression with Paxil." She was to continue taking Paxil and to continue with counselling. (Tr. 867-71.)

In March 2016, Dr. Nemani noted she had been taking a low dose of Lamictal, but she was still having headaches and possible non-epileptic seizures. The dosage was increased. (Tr. 832-33.)

**4. Opinion Evidence**

In March 2015, Harry J. Deppe, Ph.D., performed a consultative psychological exam of plaintiff. This exam took about 44 minutes. Dr. Deppe diagnosed major depression, single episode, in remission, and personality disorder. He opined that plaintiff's ability to understand and follow simple instructions and ability to maintain attention required to perform simple, repetitive tasks were intact. (Tr. 750-53.)

Counsellor Carlie Kasten submitted two letters. In February 2016, she wrote that plaintiff met the criteria for major depressive disorder, recurrent. She said that plaintiff was often tearful and reported high levels of hopelessness. Her financial situation was dire, which added to her anxiety and depression. (Tr. 824.) In July 2016, she stated that plaintiff had begun isolating and was emotionally detaching. She stated that, if plaintiff's "basic needs could be met at a more stable rate, there is a high probability that her mental health would improve greatly." In both letters, Ms. Kasten said that plaintiff "came into service" on December 9, 2014.

## Analysis

The Court turns first to plaintiff's challenge to the ALJ's evaluation of her statements

regarding her symptoms. Plaintiff argues that the ALJ misstated the record and did not give good reasons grounded in the evidence for his findings.

The credibility findings of the ALJ are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). Social Security regulations and Seventh Circuit Court of Appeals cases, "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding." *Schmidt v. Barnhart*, 395 F.3d 737, 746-47 (7th Cir. 2005).

Social Security Ruling (SSR) 16-3p, 2016 WL 1119029 (Mar. 16, 2016), effective March 28, 2016, superseded SSR 96-7p, 1996 WL 374186, on evaluating the claimant's statements about her symptoms. SSR 16-3p does not change the prior standard; rather, it emphasizes that:

> In evaluating an individual's symptoms, our adjudicators will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation. The focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person. Rather, our adjudicators will focus on whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities. . . .

SSR 16-3p, 2016 WL 1119029, at *10. As did SSR 96-7p, the new SSR requires the ALJ to consider the entire record, and to consider a number of factors in assessing the claimant's credibility, including the objective medical evidence, the claimant's daily activities, medication for the relief of pain, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 16-3p, 2016 WL 1119029, at *7.

The ALJ is required to give "specific reasons" for his evaluation of plaintiff's statements.

*Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). It is not enough just to describe the plaintiff's testimony; the ALJ must analyze the evidence. *Id.*; *see also Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009) (The ALJ "must justify the credibility finding with specific reasons supported by the record.") If the adverse credibility finding is premised on inconsistencies between plaintiff's statements and other evidence in the record, the ALJ must identify and explain those inconsistencies. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). "The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2016 WL 1119029, at *9.

Here, the reasons given by the ALJ for rejecting plaintiff's statements are not supported by the record and are not valid. ALJ Onderak said he did not accept plaintiff's claims about the intensity, persistence, and limiting effects of her symptoms because her statements were not consistent with the medical evidence and "other evidence." (Tr. 28.)

The ALJ first pointed out that plaintiff "was able to work for years with her bladder problems." (Tr. 28.) This statement ignores the medical evidence indicating that her bladder problems worsened such that she needed surgery in September 2014 and that the surgery was not successful in controlling her type 3 urinary incontinence and urge incontinence. The subsequent cystoscopy and periurethral collagen bulking procedure was similarly unsuccessful, as was physical therapy for pelvic floor rehabilitation. Strangely, the ALJ described plaintiff's treatment for bladder problems as "minimal" despite her undergoing two surgical procedures. (Tr. 28.) This characterization suggests that he failed to understand the nature of her treatment. He also pointed out that she did not follow up on a referral to a specialist because it was hard for

her to get to Mt. Vernon. (Tr. 28.) However, that was a reference to her failure to see a specialist in October 2013, ten months prior to the alleged disability date. (Tr. 478.)

The ALJ also said that the evidence of her daily activities was inconsistent with her allegations of "extreme limitations." He said that she was able to do simple cooking, simple cleaning, laundry, and shopping. He also said she did some camping and hiking/walking. He cited statements submitted by plaintiff's mother, Bonnie Carner, for this information. In a contradictory move, the ALJ later said that he rejected Ms. Carner's "opinions." (Tr. 30.) It is unclear which of her observations the ALJ considered to be "opinions."

The statements from plaintiff's mother are her answers to questions submitted to her by the agency. (Tr. 422-43.) These statements were submitted in October 2014 and January 2015. Ms. Carner said that plaintiff took her kids to school and did "what the Dr. says she can do." She cooked "light meals" and sandwiches. She made one meal a day when she could and everyone had to help themselves for other meals. Her children helped with house and yard work. Ms. Carner said that plaintiff could not climb to put items away, mop, sweep, or reach up. She also said that plaintiff could not lift more than five pounds. She said that plaintiff has to use the bathroom every fifteen minutes. She "most always" did not make it to the toilet in time. She shopped for food and personal items once a week or once a month. As for camping and hiking, that information came in response to the question, "What are his/her hobbies and interests?" Ms. Carner's answer was "Camping, hiking, watching TV, walking but now it's very heard [sic] for her to do these things." When asked to describe any changes in these activities since her conditions began, Ms. Carner said, "She doesn't get out very much." She also said that plaintiff walks very slowly, limps, and is in a lot of pain. (Tr. 440.) Lifting, bending, and walking caused plaintiff to "wet" herself. (Tr. 441.) Ms. Carner ended her statement by saying that her

daughter was "very depressed" and cries a lot. (Tr. 443.)

The Court has quoted from Ms. Carner' statements at length to demonstrate that the ALJ's summary of them was woefully inadequate. "The ALJ simply cannot recite only the evidence that is supportive of her ultimate conclusion without acknowledging and addressing the significant contrary evidence in the record." *Moore v. Colvin*, 743 F.3d 1118, 1124 (7th Cir. 2014). Fairly read, Ms. Carner's statements do not support the ALJ's conclusion that plaintiff's daily activities contradict her statements about her symptoms. Further, the limited activities described by Ms. Carner in no way support a finding that plaintiff is capable of full-time work. "We have repeatedly cautioned that a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time." *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013).

The erroneous evaluation of the plaintiff's statements about her symptoms requires remand. "An erroneous credibility finding requires remand unless the claimant's testimony is incredible on its face or the ALJ explains that the decision did not depend on the credibility finding." *Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014).

Reconsideration of plaintiff's credibility will also require a "fresh look" at the medical opinions and plaintiff's RFC. *Id.* It is therefore not necessary to analyze plaintiff's arguments regarding the RFC assessment in detail. The Court notes that the ALJ disregarded Carlie Kasten's opinion in part because he perceived that she was incorrect in stating that plaintiff had been treating with her since December 2014. (Tr. 24.) In fact, it was the ALJ who was incorrect. Although there are no notes of counselling sessions before December 2015, the records of the Community Resource Center and of Dr. Keeven indicate in several places that plaintiff had begun receiving services at CRC in December 2014 and had been attending regular

counselling sessions with "Carlie" since then. Further, the ALJ was wrong to reject Ms. Kasten's opinion because she was not an "acceptable medical source." *Voigt v. Colvin*, 781 F.3d 871, 878 (7th Cir. 2015). Lastly, the ALJ did not explain how the effects of the stress incontinence and urge incontinence described in Dr. Asbery's records would be sufficiently accommodated by proximity to an accessible bathroom and ability to take regularly scheduled breaks at the worker's discretion.

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff is disabled or that she should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

**Conclusion**

The Commissioner's final decision denying Karen Louann Stevenson's application for social security disability benefits is **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. § 405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**
**DATE: November 6, 2017**

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**UNITED STATES DISTRICT JUDGE**